UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 07 CR 410 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SMITH, and | ) | Hon. Harry D. Leinenweber |
| GREGORY HARRIS. | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS'
MOTIONS TO SUPPRESS EVIDENCE**

Now comes the United States of America, by and through Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, and respectfully submits this response to the following motions: (1) defendant Michael Smith's motion to suppress evidence seized after warrantless stop (hereinafter, "Smith Motion"); (2) Gregory Harris' motion to suppress evidence illegally seized from Pacifica (hereinafter, "Harris Pacifica Motion"); and (3) Gregory Harris' motion to suppress evidence illegally seized from Voyager (hereinafter, "Harris Voyager Motion"). For the reasons set forth below, the Court should deny each of motion without an evidentiary hearing.[1]

---

[1] The government has filed a consolidated response to these three motions because they involve similar facts. In addition, Harris filed a motion joining Smith's motion to suppress evidence.

**I.    BACKGROUND**

    **A.    Calvin Buffington's Drug Trafficking Organization and Its Ties to Michigan Known to Law Enforcement Prior to the Stop of Smith and Harris.**

On December 21, 2006, DEA agents met with a confidential source (hereinafter, "CS-1"), who stated that CS-1 knew Calvin Buffington (hereinafter, "Buffington") most of CS-1's life.[2] CS-1 also informed DEA agents that Buffington was a multi-kilogram dealer of cocaine based in Chicago, Illinois. Subsequently, CS-1 informed DEA agents that CS-1 met with Buffington on December 28, 2006. At that time, Buffington told CS-1 that he was flying from Chicago to Detroit to pick up drug proceeds.[3]

More specifically, on this same date, Buffington told CS-1 that he was going to Detroit to "holler at his cousin", which CS-1 understood to mean that Buffington was going to pick up the drug proceeds from his cousin. The CS-1 also stated that Buffington sold kilograms of cocaine to his cousin and that Buffington used one of his girlfriends to transport cocaine to Detroit for him.

On January 8, 2007, CS-1 informed DEA agents that CS-1 had been at 11543 South Carpenter Street, Chicago, Illinois, which is Lois Buffington's residence (hereinafter, "Lois' Residence"). Lois Buffington is Calvin Buffington's mother. When CS-1 first arrived at Lois'

---

[2] The facts set forth in the government's response brief are based on: (i) reports produced by the DEA and the Gary, Indiana Police Department, which have been provided to defendants; (ii) the June 27, 2007 Affidavit of DEA Special Agent Brent Williams, which was filed in support of the criminal complaint in this case; (iii) March 14, 2007 Affidavit of DEA Task Force Officer Jeffrey Nicholas Trevino, which was filed in support of a criminal complaint against Michael Smith in the Northern District of Indiana, which has been provided to defendants; and (iv) information provided by the law enforcement agents involved in defendant's stop, search, and arrest. The government will provide the DEA and Gary, Indiana Police reports as well as the March 12, 2007 Affidavit of DEA Task Force Agent Trevino to the Court upon request.

[3] DEA agents later confirmed that Buffington took an airplane from Midway Airport, in Chicago, to Detroit, Michigan on this date.

Residence, CS-1 stated that CS-1 saw Buffington with two other male individuals. As CS-1 approached Buffington, Buffington pulled out a handgun from his waistband. Buffington returned the handgun to his waistband after he recognized CS-1. CS-1 and Buffington then went inside Lois' Residence, while the other two male individuals waited outside. CS-1 and Buffington then went down to the basement, where CS-1 saw Buffington's cousin from Detroit and two male individuals. While in the basement, CS-1 observed stacks of money, which were being counted by one of the male individuals. Buffington then showed CS-1 a black duffel bag filled with approximately 20 kilograms of cocaine. Shortly thereafter, CS-1 left. While leaving Lois' Residence, CS-1 saw a maroon Hummer and a black Buick LeSabre, both with Michigan License plates parked in front of Lois' Residence.

On January 21, 2007, law enforcement agents conducted surveillance at Lois' Residence. DEA agents saw two vehicles with Michigan license plates parked in front of Lois' Residence. The first vehicle was a 2006 white Ford Explorer registered to Alphonse Bettis at a Detroit address. The second vehicle was a 2002 white Chevrolet Impala registered to Mae Jean Sanders at a Detroit address.

On January 31, 2007, the Michigan State Police (hereinafter, "MSP") seized approximately $349,716 from John Slate's vehicle, while he was driving south toward Illinois. A second confidential Source (hereinafter, "CS-2") identified John Slate, who CS-2 also knows as "Flip", as the principal carrier of narcotics and narcotics proceeds for Buffington. Upon searching Slate's vehicle, MSP troopers located the cash hidden in the natural voids in the back seat body panels of the vehicle. The cash was packaged in nine separate bundles. Eight of the bundles were wrapped

in plastic and labeled to indicate the amount of cash contained within the bundle. The contents of each individual bundle ranged from $5,000 to $50,000.

      **B.**      **Traffic Stops of Smith and Harris on March 12, 2007.**

At approximately 6:00 p.m. on March 12, 2007, surveillance was established at Lois' Residence. A few minutes later, surveillance observed Calvin Buffington sitting on the front porch of Lois' Residence while talking on a cellular telephone.

At approximately 6:25 p.m., surveillance observed a blue 2007 Chrysler Pacifica bearing Michigan registration (hereinafter, "the Pacifica") arrive and park on Carpenter Street in front of Lois' Residence. The Pacifica is registered to Gregory Harris (hereinafter, "Harris") at 17634 Merganser Drive in Clinton Township, Michigan. Surveillance observed Harris and Marvin Inkton (hereinafter, "Inkton") exit the Pacifica and walk towards the rear of Lois' Residence, where surveillance could not observe their activity. Before losing sight of Harris, surveillance saw Harris carrying a white shopping bag.

At approximately 6:35 p.m., surveillance observed Harris and Inkton walk empty-handed out from alongside Lois' Residence to the Pacifica. Surveillance saw Harris and Inkton reenter the Pacifica and drive away from the area. Surveillance followed the Pacifica from Lois' Residence to a gas station located at the intersection of 115th Street and Halsted Avenue in Chicago, which was a few blocks from Lois' Residence.

Shortly thereafter, surveillance observed a green 2007 Chrysler Voyager bearing Michigan registration (hereinafter, "the Voyager") enter the gas station. The Voyager is registered to Harris at 17634 Merganser Drive in Clinton Township, Michigan. Surveillance saw the driver of the Voyager, who was later identified as Michael Smith (hereinafter, "Smith"), meet with Harris and

Inkton at the gas station. Surveillance next observed Harris enter the passenger seat of the Pacifica and Inkton enter the driver's seat of the Pacifica. Surveillance also observed Smith enter the driver's seat of the Voyager. Surveillance then saw the Pacifica and the Voyager depart the area. Surveillance noted that the two cars traveled in tandem with the Pacifica following the Voyager. Law enforcement conducting surveillance at the time recognized that drug traffickers transporting narcotics in a vehicle are often followed by a second car for purposes of security.

Surveillance agents followed the Pacifica and the Voyager from the gas station to a McDonald's located at 600 East 115th Street in Chicago, Illinois. At approximately 6:45 p.m., surveillance observed the Voyager and the Pacifica park in the parking lot of the McDonald's. Surveillance saw Smith exit the Voyager, enter the McDonald's, exit the McDonald's shortly thereafter and then reenter the Voyager. At approximately 6:50 p.m., surveillance saw the Voyager and the Pacifica leave the McDonald's. Again, the vehicles were traveling in tandem with the Pacifica following the Voyager.

Surveillance followed the Pacifica and the Voyager from the McDonald's to I-94. Surveillance continued to follow the Pacifica and the Voyager as the vehicles traveled eastbound on I-94/80 into Indiana. While conducting this surveillance, surveillance requested and obtained the assistance of Officer Jeff Hornyak (hereinafter, "Officer Hornyak"), from the Gary Police Department (hereinafter, "GPD"). At the time, Officer Hornyak was informed that other law enforcement agents believed the cars were transporting narcotics.

At approximately 7:24 pm, Officer Hornyak observed the Pacifica and the Voyager traveling together in excess of the posted speed limit. Officer Hornyak positioned his fully marked police vehicle a short distance behind the vehicles and paced the speed of the vehicles from Grant Street

to I-65. Officer Hornyak established the speed of the vehicles to be approximately 70 miles per hour in a 55 miles per hour zone. As a result, Officer Hornyak initiated a traffic stop of the Voyager.

Officer Hornyak approached the driver side window and observed that the Voyager was occupied by only one person, the driver. The driver was identified by a Michigan driver's license as Smith. Officer Hornyak obtained the Voyager registration from Smith, at which time Officer Hornyak noticed that Smith was not the registered owner of the Voyager. Smith stated that his brother-in-law, Harris, was the owner. Smith said he was coming from Chicago, Illinois where he had been visiting family "overnight." When Officer Hornyak asked Smith which of Smith's family members live in Chicago, Smith hesitated before responding with "um, my uncle." Based on his training and experience, Officer Hornyak believed that Smith was nervous during the conversation and was providing deceptive answers.

Officer Hornyak then asked Smith to remain in the Voyager while Officer Hornyak returned to his patrol car to issue Smith a citation for speeding. Because Officer Hornyak believed that Smith was being dishonest, Officer Hornyak contacted a K-9 Unit officer from the Lake Station Police Department, to come to the scene. Officer Hornyak then exited his vehicle and spoke again with Smith. Officer Hornyak asked Smith to exit the Voyager and stand on the shoulder side of the highway for his own safety while Officer Hornyak advised Smith of the contents of the citation.

Officer Hornyak then advised Smith that he was being issued a citation for speeding. Officer Hornyak next asked Smith where he lived. Smith stated "Detroit." When Officer Hornyak asked Smith how long Smith had been in Chicago, Smith stated "all weekend," which was inconsistent with Smith's earlier assertion that he had been in Chicago only "overnight." Officer Hornyak also noticed Smith was avoiding eye contact and appeared to be more nervous than at the beginning of the traffic stop.

Officer Hornyak returned all of Smith's documents to him, along with the citation for speeding, and advised Smith to drive more slowly on the highway. Officer Hornyak then told Smith to have a good night. Smith then turned around and started to walk back to his vehicle. Officer Hornyak then told Smith that he was working drug interdiction and explained to Smith that it was common for illegal narcotics and weapons to be transported by vehicles along highways. Officer Hornyak then asked Smith if he had any weapons or narcotics in the Voyager, to which Smith responded "I don't have anything on me." Officer Hornyak found this response odd because Smith seemed to be disavowing ownership of anything that might be found in the Voyager.

Officer Hornyak then asked Smith for consent to search the Voyager, which Smith immediately gave by saying "that's fine" and gesturing toward the Voyager with a shrug and slight waive of arms. However, when Officer Hornyak presented Smith with a consent form memorializing Smith's verbal consent to search, Smith refused to sign the form and said "no, you're not searching" the Voyager. Officer Hornyak responded by telling Smith, "OK, you can refuse, that's your right" and instructing Smith that a canine unit was on the way. Officer Hornyak then told Smith that he could sit in the Voyager while waiting for the canine unit to arrive. Smith then returned to the Voyager and sat in the driver's seat while waiting for the canine unit to arrive. Officer Hornyak saw that Smith had all of his documents and the Voyager's keys while sitting in the Voyager.

Within five minutes of Smith withdrawing his verbal consent to search the Voyager, the canine unit officer arrived and directed his narcotic's detection dog around the outside of the Voyager. The canine gave a positive alert to the presence of an odor of a controlled substance coming from the rear passenger area of the Voyager. Specifically, the dog immediately alerted at the rear wheel well on the passenger's side of the Voyager by vigorously scratching that area. Then,

after circling around the front of the Voyager and returning to the rear of the Voyager, the dog again alerted at the tailgate of the Voyager, toward the passenger's side of the Voyager.

Based on the canine's alerts while inspecting the outside of the Voyager, the dog then was deployed inside the Voyager, where it alerted once again to the rear passenger area of the Voyager by vigorously scratching the carpet in that area. Officer Hornyak then visually inspected the area of the canine alerts and observed that the rear most speaker was missing on the passenger side. Officer Hornyak also observed a white plastic item stuffed behind the wall in that area. Upon closer inspection, Officer Hornyak discovered a white brick-like object wrapped in plastic tape. Based on his training and experience, the Officer Hornyak recognized the brick-like object to be a suspected kilogram of cocaine.

Officer Hornyak then had Smith placed in wrist restraints. Officer Hornyak noticed more kilogram-sized bricks of suspected cocaine behind the panel. Later law enforcement recovered additional suspected bricks of cocaine from the Voyager, totaling approximately 5.82 kilograms. Law enforcement also seized two cellular telephones from Smith and another inside the Voyager.

At approximately 7:35 p.m., Agent Trevino conducted a traffic stop of the Pacifica on I-65 eastbound for speeding. Agent Trevino obtained identification from the driver, which was Marvin Inkton, and the passenger of the Pacifica, which was Harris. Agent Trevino later interviewed Inkton, who stated that he and Harris were returning to Detroit after visiting Harris's dying uncle in the Chicago area. According to Inkton, he and Harris had only been in Chicago on Monday, March 12, 2007. Harris was later interviewed and stated that he and Inkton were returning to Detroit from visiting Harris' dying uncle in the Chicago area. Contrary to Inkton's account, however, Harris stated that he and Inkton had been in the Chicago area since the evening of Sunday, March 11, 2007. Both Harris and Inkton stated that they were traveling with one another, and were not traveling in

tandem with another person or another vehicle, which agents knew to be untrue based on the surveillance.

While conducting the traffic stop of Harris and Inkton, Agent Trevino learned from Officer Hornyak that he had discovered packages of cocaine from the Voyager, which was registered in Harris' name. Based on this information, as well as the information provided to Trevino regarding the surveillance of the Voyager and Pacifica, the inconsistencies in the statements of Inkton and Harris, Agent Trevino decided to detain both Inkton and Harris. Trevino inventoried the contents of the vehicle before it was towed to the police station. Trevino recovered 6 cellular telephones.

Following the traffic stops and searches of the Pacifica and Voyager, the Gary Police Department detained Harris, Inkton and Smith. GPD released Inkton on March 12, 2007, and Harris and Smith on March 13, 2007.

## II.  ARGUMENT

Defendants' motion should be denied outright, without a hearing, because they fail to identify any contested factual issue that would entitle them to relief, and have failed to provide any evidence in support of their motions. Specifically, they fail to provide an affidavit in support of their motions. This fact alone warrants that the motions be denied. Moreover, even the facts alleged in defendants' motions do not provide a basis for a finding that evidence should be suppressed.

### A.   Applicable Law

The purpose of a motion to suppress is to prevent use of materials seized in violation of the Fourth Amendment–*i.e.*, to suppress the fruit of an illegal search or seizure. *United States v. Calandra*, 414 U.S. 338, 347 (1974); *Wong Sun v. United States*, 371 U.S. 471 (1963); *United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986). A defendant who seeks a hearing to suppress evidence has the burden to show that there are disputed issues of material fact as to how the evidence in question was obtained. *See United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004); *United*

*States v. Walker,* 237 F.3d 845, 850 (7th Cir. 2001); *United States v. Goudy,* 792 F.2d 664, 667 (7th Cir. 1986).

      **B.    Defendants' Motion Should be Denied as it Relies on Conclusory and Unsworn Allegations.**

As a threshold matter, defendants' motions are patently deficient - they are unsupported by any sworn statements by the defendants or any other individual. However, well-established case law in this Circuit provides that a defendant who moves to suppress evidence "bears the burden of making a prima facie showing of illegality." *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) (affirming denial of motion to suppress without hearing where defendant fails to assert nonconjectural facts supporting his claim to be in custody). To meet this burden, the defendant must present "definite, specific, detailed, and nonconjectural facts." *Id.* If a defendant does not support the facts he alleges with an affidavit or other sworn statement, the district court will deny the motion to suppress without an evidentiary hearing. *See*, *e.g.*, *Id.* at 1212-13.; *United States v. Harris,* 914 F.2d 927, 933 (7th Cir. 1990) (affirming denial of motion to suppress without hearing where defendant's allegation that he did not receive proper *Miranda* warnings was not supported by clearly articulated factual charges); *United States v. McCarter*, 307 F. Supp. 2d 991, 994 (N.D. Ill. 2004) (denying motion to suppress without a hearing when defendant "presented nothing beyond his bare allegations" and failed to "supply a supporting affidavit"); *United States v. Mallard*, 93 CR 566, 1994 WL 22958, at *2 (N.D. Ill. January 25, 1994) (denying defendant's suppression motion without a hearing when defendant's "motion omit[ed] crucial details, ma[de] conclusory unsworn allegations, and provide[d] no evidence supporting her claims.")

In this case, the defendants make no factual assertions whatsoever. Rather, defendants' attorneys assert in legal motions – unsupported by an affidavit or any other sworn statement – that the searches were illegal. Because the defendants have not presented definite, specific, detailed, or

nonconjectural facts to support their motions, those motions should be denied without an evidentiary hearing.

### C. Defendants' Motions Should be Denied Because Their Constitutional Rights Were Not Violated.

1. <u>Search of Voyager</u>

With respect to the search of the Voyager, Smith argues that his continued detention by Officer Hornyak was unreasonable because "the officer had nothing but a generalized suspicion . . . and that suspicion was insufficient to hold the defendant for further fishing expeditions." Smith Motion at 7. Harris argues that the Voyager search was unreasonable because he owned the vehicle, he was nearby when the stop occurred, and law enforcement agents did not obtain his consent. These arguments are without merit.

First, there can be no dispute that Officer Hornyak had probable cause to stop the Voyager when he observed it exceeding the posted speed limit. *United States v. Dowthard*, 500 F.3d 567, 569 (7th Cir. August 29, 2007) ("An officer has probable cause for a traffic stop when she has an 'objectively reasonable' basis to believe a traffic law has been violated"). While Smith was in custody during the stop, "it was not improper for police to question him so long as the nature and duration of the stop remained reasonable." *Martin*, 422 F.3d 597, 601 (7th Cir. 2005), citing *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002). "A traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed." *Martin* 422 F.3d at 601-602. In situations in which an officer can articulate grounds that establish reasonable suspicion of criminal activity, he may extend the duration of the traffic stop to investigate that activity. *United Stats v. Walden*, 146 F.3d 487, 490 (7th Cir. 1998). Whether reasonable suspicion exists depends on a consideration of the totality of the circumstances known to the officer

at the time including his experiences and common sense. *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002). Additionally, "the use of a drug-sniffing dog during an otherwise lawful traffic stop does not implicate a defendant's legitimate privacy interests." *Martin,* 422 F.3d at 602.

Here, Officer Hornyak had a reasonable suspicion of drug trafficking that warranted extending the duration of the traffic stop of Smith. First, Officer Hornyak knew from other law enforcement agents that they suspected that the Voyager was transporting narcotics from Chicago to Michigan.[4] More specifically, Officer Hornyak knew through the other law enforcement agents that Buffington's drug trafficking organization was selling drugs to customers in Michigan and transporting the drugs to Michigan in various vehicles. He also knew that the Pacifica, which was driving in tandem with the Voyager, a tactic often used by drug couriers, was seen at Lois' Residence, a known stash house, earlier that day. After leaving Lois' Residence, law enforcement saw Harris meet with Smith at gas station near Lois' Residence before driving toward Michigan. Officer Hornyak also knew that the Voyager and Pacifica both had Michigan license plates.

Officer Hornyak learned even more to support his reasonable suspicion once he stopped Smith for speeding. During the course of the traffic stop, Officer Hornyak noted that Smith was not the registered owner of the Voyager. He also noted that Smith was nervous, evading eye contact and was providing deceptive and inconsistent answers to his questions. Officer Hornyak also noted that Smith seemed more nervous as the traffic stop continued.

Based on these facts, Officer Hornyak had a reasonable suspicion that Smith was trafficking narcotics and had Smith wait five minutes, in the Voyager, for a canine unit to arrive and inspect the Voyager. The facts known to Hornyak warranted the five minute delay for canine unit to arrive and

---

[4] "When law enforcement officers are in communication regarding a suspect . . . the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine." *United States v. Lenoir*, 318 F.3d 725, 728 (7th Cir. 2003).

this delay was reasonable. *Martin*, 422 F.3d 597, 602 (stating that a twenty minute delay of defendant after traffic stop was warranted for canine unit to arrive when law enforcement officer obtained conflicting statements, learned of prior arrests, and learned from another law enforcement officer that defendant was believed to be a drug trafficker); *United States v. Carpenter*, 406 F.3d 915, 916-17 (7th Cir. 2005) (stating that five minute delay waiting for canine unit did not make the stop unreasonably long because a "modest incremental delay for a person already lawfully arrested cannot be called unreasonable."); *United States v. Rogers*, 387 F.3d 925, 934 (7th Cir. 2004) (stating that based on defendant's nervous behavior, an odd unidentified odor emanating from the vehicle and defendant's prior drug history, officer "had reasonable suspicion to believe that the vehicle's occupants were engaged in drug activity and to justify calling a canine unit.") Accordingly, the stop and search were lawful.[5]

In addition, Smith also makes much of the fact in his motion that the search of the Voyager was "warrantless." However, this is a nonstarter. Once the canine unit alerted to narcotics in the Voyager, law enforcement had probable cause to search the Voayger. *Martin*, 422 F.3d at 602 ("Once the dog alerted to the presence of drugs, [law enforcement] had probable cause to search the car"); *United States v. Rogers*, 387 F.3d 925, 934 (7th Cir. 2004) ("[O]nce the canine alerted to the presence of drugs in the vehicle the officers' reasonable suspicion elevated to probable cause to further search the car.") The law is well settled that "a vehicle may be stopped and searched without

---

[5] Cases cited by defendant in support of suppressing evidence are easily distinguished from the case before the court. *See United States v. Knowles*, 525 U.S. 113, 11-119, 114-115 (1998) (search of an automobile was unconstitutional when an officer stopped a defendant for speeding and then without arresting the defendant, obtaining defendant's consent or having probable cause, conducted a search of defendant's vehicle); *United States v. Johnson*, 170 F.3d 708, 720 (7th Cir. 1999) (court suppressed evidence where police, without reasonable suspicion, stopped an individual walking out of an apartment based on an unspecific and untested individual's statement that "something fishy is sometimes going on" at the apartment).

a warrant if there is probable cause to believe the vehicle contains contraband or other evidence of illegal activity..." *United States v. Navarro*, 90 F.3d 1245, 1252 (7th Cir. 1996)(internal quotations omitted).[6]

    2.    <u>Search of Pacifica</u>

Additionally, Harris challenges the stop and search of the Pacifica. Specifically, Harris argues that "[t]here was no evidence offered to suggest that any traffic violation had been committed" and that officers were merely radioed to detain the Pacifica. Harris Pacifica Motion at 6. These arguments are without merit.

First, as explained above, Harris was stopped while a passenger in the Pacifica, when Agent Trevino had observed the Pacifica speeding. This provided probable cause to conduct a traffic stop of the Pacifica. During the course of this traffic stop, Agent Trevino learned from Officer Hornyak that he had discovered suspect cocaine inside the Voyager, which was registered to Harris. Based on this information as well as the other evidence of drug trafficking observed by surveillance agents, and Harris and Inkton's own contradictory answers during the stop, Agent Trevino arrested the two for drug trafficking. *United States v. Colonia*, 870 F.2d 1319, 1321, 1323-24 (7th Cir. 1989) (stating that there was probable cause to arrest defendant when agents had information from a reliable informant connecting defendant to drug trafficking and defendant engaged in circuitous motoring, including driving in tandem with a separate car containing narcotics). As a result of this probable cause arrest, Agent Trevino conducted a lawful inventory search of the car or search the vehicle incident to arrest. *See United States v. Wimbush*, 337 F.3d 947, 951 (7th Cir. 2003) ("Warrantless

---

[6]Harris also argues that Smith did not have authority to consent to the search of the Voyager and that the search was not a search incident to lawful arrest. Both arguments do not warrant discussion here because the government does not maintain that either doctrine applies. Instead, as explained above, the search was conducted based on probable cause from the canine unit's alert to narcotics in the Voyager.

search was valid as a routine post-arrest inventory search, which authorizes police to search vehicles in lawful custody in order to secure or protect the car and its contents"); *United States v. Jackson*, 377 F.3d 715, 716-717 (7th Cir. 2004) (stating that search incident to arrest was lawful as part of probable cause arrest following a traffic stop.)   According, the evidence was legally obtained.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Smith's Motion, Harris' Pacifica Motion and Harris' Voyager Motion without an evidentiary hearing.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:   /s/ Steven J. Dollear
STEVEN J. DOLLEAR
Assistant U.S. Attorney
U. S. Attorney's Office
219 S. Dearborn Street
Chicago, Illinois  60604
(312) 353-5359

DATED:  March 11, 2008