UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  07 CR 410-12 |
| v. | ) | |
| | ) | Hon. Harry D. Leinenweber |
| DAWNYA PARKER | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT DAWNYA PARKER'S
MOTION TO SUPPRESS TITLE III MATERIAL**

Now comes the United States of America, by and through Patrick J. Fitzgerald, United States

Attorney for the Northern District of Illinois, and respectfully submits this response to defendant

Dawnya Parker's motion to suppress Title III material.  For the reasons set forth below, the Court

should deny defendant's motion.

**I.     BACKGROUND**

This case stems from the Drug Enforcement Administration's (hereinafter "DEA")

investigation of Calvin Buffington and members of his drug trafficking organization (hereinafter "the

Buffington DTO").  The investigation resulted in a superseding indictment against Calvin Buffington

and twenty other defendants.  A significant part of the government's case is supported by substantial

and incriminating evidence obtained through the use of wiretaps on the telephones of Calvin

Buffington.  The court-authorized wiretaps in this case were based upon evidence developed during

a seven-month investigation by the DEA of the Buffington DTO.

Prior to the use of the wiretaps, the investigation identified that the Buffington DTO was

responsible for the distribution of wholesale quantities of controlled substances, namely cocaine, in

the Chicago, Illinois and Detroit, Michigan areas and elsewhere in the Midwest.  Initially, two

confidential sources (hereinafter "CS1" and "CS2") provided historical information regarding the Buffington DTO, some of its suspected members and its methods of operation. CS1 and CS2 also identified several members of the Buffington DTO and provided their addresses, telephone numbers and vehicle information to the DEA. Only CS1 was present for, but did not participate in, events that preceded and proceeded what appeared to be drug transactions between Calvin Buffington and members of the Buffington DTO.

CS1 and CS2 did not have consensually recorded calls with Calvin Buffington or members of the Buffington DTO regarding the distribution of narcotics. Furthermore, CS1 and CS2 did not participate in a controlled transaction of narcotics with Calvin Buffington or members of the Buffington DTO. CS1 and CS2 indicated that Calvin Buffington would be reluctant to conduct such a transaction because of the close-knit makeup of the Buffington DTO; and Calvin Buffington's awareness of CS1 and CS2's cooperation in other federal investigations. CS2 was unwilling to even attempt to purchase narcotics from Calvin Buffington out of concern for his/her personal safety.

Based on the information derived from the confidential sources, the DEA conducted an extensive investigation of the Buffington DTO using traditional law enforcement techniques, such as physical surveillance, and analysis of data from a phone used by Calvin Buffington. The DEA's use of those techniques led to the January 31, 2007 seizure of approximately $349,716 in narcotics proceeds from John Slate, a courier for the Buffington DTO. Those techniques also led to the March 12, 2007 seizure of approximately 5 kilograms of cocaine from Gregory Harris and Michael Smith, two Detroit-based customers of the Buffington DTO. However, those traditional techniques failed to determine the full extent of the conspiracy, including: the identities of sources of supply; the identities of other customers; the other co-conspirators; the storage sites for the cocaine; the dates,

times, places and manner of delivery of the cocaine; the existence and location of records associated with the cocaine trafficking; the location and source of the Buffington DTO's financial resources; and the methods of concealing, distributing and laundering the narcotics proceeds.

Therefore, on May 21, 2007, armed with the information gathered in the investigation up to that date, the government submitted an Application to Chief Judge James F. Holderman for authority under Title III to wiretap a cellular telephone used by Calvin Buffington (hereinafter "Target Phone One").[1] WIRS_001_0001-WIRS_001_0064. The stated purpose of the wiretap was to determine the previously listed information regarding the extent of the conspiracy in its members. *Id.* Chief Judge Holderman reviewed the Application and supporting Affidavit, and found that probable cause existed that Calvin Buffington, defendant, and others were engaged in criminal activity, that the telephone was being used in connection with that criminal activity, and that the wiretapping of Target Phone One would intercept communications concerning the criminal activity and provide the government evidence to assist in proving the existence of the conspiracy beyond a reasonable doubt. WIRS_001_0065-WIRS_001_0072. Chief Judge Holderman entered an order (hereinafter "Order") authorizing the wiretapping of Target Phone One for a period of thirty days. *Id.* In doing so, Chief Judge Holderman adopted the representations contained in the Application and Affidavit in support of the wiretap that "normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous." WIRS_001_0007.

---

[1]The government has provided the Court with a courtesy copy of the instant filing and a copy of the Applications, Affidavits, Orders, Orders to Service Providers, Ten Day Reports, Sealing Applications, Sealing Orders, and Instructions for Interception for the wiretaps referenced in this filing. The government previously provided these documents to defense counsel pursuant to the government's discovery obligations.

Pursuant to Chief Judge Holderman's Order, the government instructed DEA personnel who were responsible for monitoring the wiretap regarding the minimization of non-pertinent and other calls. WIRS_002_0014-0025. Further pursuant to Chief Judge Holderman's Order, the government submitted progress reports on the tenth and twentieth days of the wiretap of Target Phone One. WIRS_001_0078-WIRS_001_0086. The ten day report noted the May 23, 2008 seizure of approximately 8 kilograms of cocaine from Darelene Bettis and Mae Jean Sanders, couriers for a Detroit-based customer of the Buffington DTO. WIRS_001_0078-WIRS_001_0082. The ten day report further noted the May 29, 2008 seizure of approximately 10 kilograms of cocaine and approximately $15,000 from Johnnie Hughes, a courier for the Buffington DTO. *Id.* Both the ten day and twenty day reports for Target Phone One reflected the number of intercepted calls, along with the number of calls that DEA personnel had preliminarily labeled pertinent and non-pertinent. WIRS_001_0078-WIRS_001_0086. The first thirty days of the wiretap of Target Phone One reflected Calvin Buffington's concern that law enforcement was actively investigating the Buffington DTO. *See* WIRS_001_0093-WIRS_001_0164. In an effort to evade detection by law enforcement, Calvin Buffington acquired a new cellular telephone (hereinafter "Target Phone Two"), and directed members of the Buffington DTO on Target Phone One to contact him on Target Phone Two. *See id.*

On June 21, 2007, the government properly sealed before Chief Judge Holderman the first thirty days of the wiretap of Target Phone One. WIRS_001_0087-0092. On that same day, the government submitted an Application to Chief Judge James F. Holderman for authority under Title III to again wiretap Target Phone One, and wiretap a second cellular telephone used by Calvin Buffington (hereinafter "Target Phone Two"). WIRS_001_0093-WIRS_001_0164. The stated

purpose of the wiretap was to determine the previously listed information regarding the extent of the conspiracy and its members. *Id.* Chief Judge Holderman reviewed the Application and supporting Affidavit, and found that probable cause existed that Calvin Buffington, defendant, and others were engaged in criminal activity, that the telephone was being used in connection with that criminal activity, and that the wiretapping of Target Phones One and Two would intercept communications concerning the criminal activity and provide the government evidence to assist in proving the existence of the conspiracy beyond a reasonable doubt. WIRS_001_0165-WIRS_001_0172 (Target Phone One Order); WIRS_001_0179-WIRS_001_186 (Target Phone Two Order). Chief Judge Holderman entered an order (hereinafter "second Order") authorizing the wiretapping of Target Phone One and Target Phone Two. *Id.* In doing so, Chief Judge Holderman adopted the representations contained in the Application and Affidavit in support of the wiretap that "normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous." WIRS_001_0097.

Pursuant to Chief Judge Holderman's second Order, the government instructed DEA personnel who were responsible for monitoring the wiretap regarding the minimization of non-pertinent and other calls. WIRS_002_0001-WIRS_002_0025. The first several days of the continued wiretap on Target Phone One and Target Phone Two revealed that Calvin Buffington intended to move the Buffington DTO from Chicago to the Atlanta area in an effort to evade detection by law enforcement. On June 28, 2008, based in large part on the information gathered during the wiretaps, DEA agents arrested Calvin Buffington, defendant, and others pursuant to a complaint, *United States v. Calvin Buffington*, *et al.*, 07 CR 410, for their involvement in the Buffington DTO. The government subsequently sealed the continued wiretap of Target Phone One

and the wiretap of Target Phone Two. WIRS_001_0193-WIRS_001_200. The government did not file a progress report for the first ten days of the continued wiretap of Target Phone One or the wiretap of Target Phone Two.

The wiretaps on Calvin Buffington's telephones led to the interception of numerous criminal conversations between Calvin Buffington and members of the Buffington DTO regarding the business of the Buffington DTO. The wiretaps allowed the DEA to identify previously unknown co-conspirators, criminal activity, and accumulate evidence that could be used to prove the guilt of the co-conspirators beyond a reasonable doubt. Indeed, on June 28, 2008, the DEA executed several search warrants, the affidavits for which relied heavily on information gathered during the wiretap investigation, that resulted in the seizure of firearms, narcotics, and over $1,000,000 in narcotics proceeds. Those seizures included over $300,000 from a hotel room defendant was sharing with Calvin Buffington on the date of their arrest, and nearly one kilogram of heroin and a firearm from defendant's bedroom in her mother's home.

Defendant has since filed the instant motion to suppress Title III materials, arguing that the government failed to establish that the May 21, 2007 and June 21, 2007 were necessary; and that the government failed to appropriately minimize the wiretap calls. As discussed in detail below, defendant's motion challenging Chief Judge Holderman's authorization of Title III wiretaps in this case is entirely without merit and does not warrant the extraordinary relief of suppressing the wiretap evidence. Further, no hearing is necessary because the motion does not raise any dispute of material fact.

## II.    DEFENDANT HAS LIMITED STANDING TO BRING THE INSTANT MOTION

Defendant's standing to address the wiretaps is limited to those calls in which she was a party to the conversation. Since the federal wiretap involved Calvin Buffington's telephone, the interception of calls to which defendant was not a party did not intrude upon her fourth amendment rights, so she has no standing to seek suppression of evidence gathered from those intercepts. *See United States v. Thompson*, 944 F.2d 1331, 1339 (7th Cir. 1991); *see also United States v. Vargas*, 116 F.3d 195, 196 (7th Cir. 1997). Therefore, defendant may move to suppress to the fruits of all of the federal wiretaps, but only those calls to which she was a party.[2] Defendant's motion does not identify those calls to which she was a party.

## III.    THE GOVERNMENT DEMONSTRATED THE REQUISITE NECESSITY FOR THE MAY 21, 2007 AND JUNE 21, 2007 WIRETAPS

### A.    Legal Standard

Federal law requires each wiretap application to contain a full and complete statement as to one of the following: (1) whether or not other investigative procedures have been tried and failed; (2) why other investigative procedure reasonably appear to be unlikely to succeed if tried; or, (3) that other investigative procedures are too dangerous to employ. *See* Title 18, United States Code, Section 2518(1)(c); *see also United States v. Ceballos*, 302 F.3d 679, 683 (7th Cir. 2002); *United States v. Thompson*, 944 F.2d 1331, 1339-40 (7th Cir. 1991). These requirements are set forth in the alternative; therefore, the government need only establish one of the three. *See United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003); *see also United States v. Adams*, 125 F.3d 586, 595 (7th Cir. 1997).

---

[2]Defendant Gregory Harris has moved to join in defendant Dawyna Parker's instant motion. Defendant Harris lacks standing to bring such a motion as he was not a party to any of the calls intercepted during the wiretaps in this case. This Court should therefore deny defendant Harris's motion for joinder.

The judge authorizing interception under Title III must determine based upon the facts submitted by the applicant that "normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous" and reviewing courts should affirm a finding that normal investigative procedures have failed or are not likely to be successful as long as there is "a factual predicate in the affidavit." *United States v. Dumes*, 313 F.3d 372, 378 (7th Cir. 2002); *see also United States v. Zambrana*, 841 F.2d 1320, 1330 (7th Cir. 1988) (necessity for wire surveillance established where government averred that undercover officers could not infiltrate the drug conspiracy at a level to allow them to identify all co-conspirators at all levels of the conspiracy). The law in the Seventh Circuit is clear that "the government's burden of establishing its compliance with subsection 2518(1)(c) is not great," the bar for "proving 'necessity' is not high," this issue should "be viewed in a practical and commonsense fashion" and review should not be "hyper-technical." *Fudge*, 325 F.3d at 919; *see also Ceballos*, 302 F.3d at 683; *Dumes*, 313 F.3d at 378; *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995); *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991); *Zambrana*, 841 F.2d at 1329.

The finding of "necessity" is reviewed under an abuse of discretion standard, with substantial deference given to the determination of the issuing judge. *See Zambrana*, 841 F.2d at 1329-30; *see also United States v. Price*, 418 F.3d 771, 776 (7th Cir. 2005). This is a high standard to meet. *See generally, e.g., United States v. Doyle*, 121 F.3d 1078, 1093 (7th Cir. 1997) (stating that when an issue is reviewed under the "abuse of discretion" standard, the reviewing court "will reverse the ruling only when no reasonable person could agree with the district court."). Defendant cannot meet the standard in this case.

While defendant correctly points out that wiretaps are not to be employed as the initial step in a criminal investigation, neither must they be used only as a last resort in an investigation. *See Fudge*, 325 F.3d at 919; *see also Thompson*, 944 F.2d at 1340 (citing *United States v. Giardano*, 416

U.S. 505, 515 (1974)).  Use of wiretaps is not a last resort to be employed only after every other imaginable mode of investigation has been proved unsuccessful.  *See Dumes*, 313 F.3d at 378. Neither must other investigative procedures actually be implemented before an intercept order may be issued, but only that the success of other methods of investigation appears unlikely.  *Id.* at 379; *Thompson*, 944 F.2d at 1340.  Finally, "the government is not forced to run outlandish risks or exhaust every conceivable alternative" before requesting wiretap authorization. *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989).  As the Seventh Circuit has repeatedly stated, the evil that the Title III statutes "are trying to avoid is the routine use of wiretaps as an initial step in the investigation." *Fudge*, 325 F.3d at 919; *see also Thompson*, 944 F.2d at 1340.

Therefore, the government shall be found to have met its relatively low burden when the Affidavit submitted in support of the Title III Application contains a factual predicate for the conclusion that normal investigative procedures have failed or are reasonably likely to do so.  *See Fudge*, 325 F.3d at 919; *see also United States v. DeMonte*, 674 F.2d 1169, 1174 (7th Cir. 1982); *United States v. Anderson*, 542 F.2d 428, 431, (7th Cir. 1976); *United States v. Mancari*, 663 F.Supp. 1343, 1347 (N.D.Ill. 1987) .  The facts must be "sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence to the point where wiretapping becomes reasonable, given the statutory preference for less intrusive techniques." *United States v. Smith*, 31 F.3d 1294, 1298 (4th Cir. 1994); *accord United States v. Abou-Saada*, 785 F.2d 1, 11 (1st Cir. 1986). "What counts is whether the agent's assertions are supported by the facts in the Affidavit and the nature of the investigation being conducted." *United States v. Dorfman*, 542 F.Supp. 345, 359 (N.D.Ill. 1982), *aff'd, United States v. Williams*, 737 F.2d 594 (7th Cir. 1984). Thus, a reviewing court must consider the Affidavit as a whole, including the circumstances surrounding the investigation, when determining whether necessity has been established, not simply the necessity portion of the Affidavit.

The Court must also consider the objectives of the investigation in determining evaluating whether normal investigative techniques will be successful. *See Plescia*, 48 F.3d at 1463 (considering investigative goals to ascertain the extent and structure of the conspiracy and to obtain evidence to convict conspirators in reviewing and approving decision that wiretaps were necessary). After-the-fact suggestions by the defense as to how an investigation might have been handled are entitled to little weight in an analysis of whether the "necessity" requirement of 2518(1)(c) has been met. *See United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978); *see also Mancari*, 663 F.Supp. at 1350  (holding that defendants' "post-factum suggestions as to how an investigation might have been handled [without wiretapping] are entitled to little weight in an analysis of statutory compliance with [18 U.S.C.] 2518(1)(c)").

### B.    Chief Judge Holderman Did Not Abuse His Discretion by Finding the May 21, 2007 and June 21, 2007 Wiretaps to be Necessary

When adopting the necessity requirement, Congress envisioned the normal investigative procedures that should be used or considered prior to resorting to wiretaps to include:

> ....[1] standard visual or aural surveillance techniques by law enforcement officers, [2] general questioning or interrogation under an immunity grant, [3] use of regular search warrants, and [4] the infiltration of conspiratorial groups by undercover agents or informants.

*Zambrana*, 841 F.2d at 1329 n.8, quoting U.S. Code & Ad. News 1968, pp. 2112, 2190.

The Affidavits at issue in this case were legally sufficient because they set forth the Special Agent/Affiant's experience and opinion that normal investigative techniques had been tried and failed or reasonably appeared unlikely to succeed if tried or were too dangerous and would be unsuccessful as far as meeting all the goals of the investigation of the Buffington DTO, its members and its methods of operation.  *See Ceballos*, at 684 (affidavits from experienced DEA Special Agents sufficient when they state reasons why particular investigative methods are not likely to succeed);

*Ashley*, 876 F.2d at 1072 (issuing judge may properly take into account affirmations which are founded upon the affirmations of specially trained agents).

The Affidavits as a whole provided case-specific and commonsense reasons why wiretapping was appropriate and necessary. The Seventh Circuit has repeatedly held that such case-specific and commonsense reasons justify wiretapping. *See, e.g., Fudge*, 325 F.3d at 918-19 (other methods of investigation and prosecution would compromise the government's ability to successfully prosecute all the conspirators); *Dumes*, 313 F.3d at 378-80 (use of successive wiretaps upheld because other investigative techniques were not likely to succeed or had in fact failed to secure evidence or penetrate the organization); *Ceballos*, 302 F.3d at 683-84 (use of wiretaps upheld because they were only investigative method likely to reveal the full extent of the conspiracy and its members); *Adams*, 125 F.3d at 595-96 (use of wiretap upheld because Affidavit supported contention that other methods of investigation would be unsuccessful in identifying the drug suppliers and in discerning the full scope of the conspiracy and use of physical surveillance might alert the co-conspirators to the existence of the investigation); *Farmer*, 924 F.2d at 652 (7th Cir. 1991) (finding defendant's challenge to government Affidavits "specious" when they provided much less detailed justifications for wiretapping than those provided in the Buffington DTO Affidavits). Each Affidavit reviewed by the Chief Judge indicated that the Special Agent affiant believed that there probable cause to believe that the wiretaps on telephones of Calvin Buffington would reveal evidence as to the identities of sources of supply, customers, other co-conspirators; the storage sites for the cocaine; the dates, times, places, and manner of delivery of the cocaine; the existence and location of records such as drug ledgers associated with the cocaine trafficking; the location and source of the conspiracy's financial resources; and the methods of concealing, distributing and laundering the narcotics proceeds. The Affiants then affirmed their beliefs that "based upon all the facts set forth" in the Affidavits, "the interception of wire communications is the only available investigative

technique that ha[d] a reasonable likelihood of securing evidence necessary to prove beyond a

reasonable doubt that the [members of the Buffington DTO] and others yet unknown are committing

the [listed] offenses."  WIRS_001_0050; WIRS_001_0146.

Each Affidavit also contained a "necessity section" in which the Affiants explained

> while normal investigative procedures have been successful in initiating this investigation,
> these investigative procedures have been tried and failed or appear reasonably unlikely to
> succeed if tried, or are too dangerous to employ.  These other investigative techniques have
> not been able to establish the identities of all those participating in the illegal activity, nor
> does the use of all the methods discussed allow law enforcement officers to obtain evidence
> on the entire drug trafficking organization.

WIRS_001_0051; WIRS_001_0148.

Specifically, the Affidavits included descriptions[3] of the following investigative methods:

1.    PHYSICAL SURVEILLANCE

With respect to physical surveillance, the Affiants averred that the government had done

extensive street surveillance and succeeded in identifying several members of the Buffington DTO,

locations that were possibly used by members of the Buffington DTO to receive, store, process, and

distribute narcotics and narcotics proceeds, and several methods of operation used by the co-

conspirators to traffic the cocaine.  Indeed, each of the Affidavits provided very detailed accounts

of dates, times, places and evidence gathered through the use of physical surveillance, as well as the

limitations of that investigative technique.  Each Affidavit explained that surveillance in and of itself,

---

[3]As a fallback argument, defendant contends that the certain arguments with respect to
"necessity" contained in the Affidavits are "boilerplate" and therefore legally insufficient.  This
claim has no merit, however, because the Affidavits contained numerous case-specific references
to the subjects of the investigation, the conduct under investigation and explained why, in this
context, certain investigative techniques were inadequate to obtain the objectives of the
investigation.  Moreover, the fact that similar investigations had suffered from common
investigative problems does not automatically mean that the common reasons why normal
investigative techniques would not reasonably succeed are "boilerplate language."  Instead, they
are accurate statements based on the Affiant's experience.

while useful when it is highly successful, rarely succeeded in gathering evidence of all the criminal activities under investigation or all of the persons committing the crimes.

In this case, surveillance of the known members of the Buffington DTO was conducted, but the Affiants noted that "[p]rolonged or regular physical surveillance of the targets would most likely be noticed, causing them to become more cautious in their illegal activities, to flee to avoid further investigation and prosecution, to cause a threat to the safety of the confidential sources, or to otherwise compromise the investigation." WIRS_001_0052-WIRS_001_0053; WIRS_001_0149. Additionally, the surveillance did not result in the identification the members of the Buffington DTO, due to the fact that the organization was made up of family members and life-long friends of Calvin Buffington. The organization operated in a compartmentalized manner, making difficult to identify members of the Buffington DTO, including the its suppliers and customers. However, the Affiants noted that "[e]ven if agents were able to find a way to observe some activities of the targets through physical surveillance, physical surveillance, if not used in conjunction with other techniques, including electronic surveillance, is of limited value." WIRS_001_0053; WIRS_001_0149-WIRS_001_0150.

## 2.    GRAND JURY SUBPOENAS

With respect to the use of grand jury subpoenas and obtaining grand jury testimony, the Affidavits explained that those methods were not likely to be successful because the subjects of the investigation, should they be called to testify, would most likely invoke their Fifth Amendment privileges, or if they testified, would not do so truthfully unless they were confronted with specifics regarding the government's investigation, which in turn would make them aware of the existence of a law enforcement probe. Once they knew they were under investigation, they would likely become more circumspect in their activities, destroy existing evidence, or worse, flee from the Chicago area, thus impairing a successful prosecution.

3.    CONFIDENTIAL SOURCES AND UNDERCOVER AGENTS

With respect to the use of confidential sources of information, defendant does not challenge the government's position that CS1 and CS2 were used in the investigation and provided invaluable insights into the Buffington DTO.  Nor does defendant challenge the government's position that the DEA's use of CS1 and CS2 was limited in that Calvin Buffington was aware of their status as cooperators in other federal investigations, and would therefore be reluctant to conduct a narcotics transaction with them. CS2 further limited his/her own use by expressing an unwillingness to even attempt a controlled purchase of narcotics from Calvin Buffington out of concern for his/her personal safety.  During the first thirty days of the wiretap on Target Phone One, CS1 did not provide the DEA with any additional information regarding the Buffington DTO.  During that same period of time, CS2 only provided the DEA with a license plate for defendant John Slate.

The Affidavit for the June 21, 2007 wiretaps detailed the May 30, 2007 efforts of another DEA group to conduct a sale of 25 kilograms of "sham" cocaine between a third confidential source (hereinafter "CS3") and a person CS3 knew as "Ghost Dog". *See* WIRS_001_0152-WIRS_001_0153.  The DEA group investigating the Buffington DTO later identified "Ghost Dog" as Calvin Buffington.  Prior to May 30, 2007, CS3 had minimal telephone contact with Calvin Buffington, and no knowledge regarding the operation of the Buffington DTO.  Calvin Buffington required CS3 to provide him with a sample kilogram of cocaine before the transaction for the 25 kilograms of "sham" cocaine could be completed.  CS3 was unable to provide Calvin Buffington with a sample kilogram of cocaine, the transaction was never completed, and CS3 had no further contact with Calvin Buffington.  The government was not aware of any other informants or confidential sources who could infiltrate the Buffington DTO and identify all of the members of the organization and the full scope of the conspiracy.

With respect to the use of undercover agents, the Affiants explained that the Buffington DTO consisted of close friends and family members of Calvin Buffington, thereby making it "extremely unlikely that an undercover agent could, within a reasonable period of time, gain the same level of trust such that he/she would be able to gather additional information leading to a successful prosecution." WIRS_001_0055-WIRS_001_0056; WIRS_001_0153. Clearly, the Special Agent/Affiant's investigatory experience led him to the reasonable conclusion that the use of undercover agents would not likely result in the successful infiltration of the Buffington DTO. Moreover, the Special Agent/Affiant's reasonably determined that "the likelihood of an undercover agent being identified as law enforcement and the damage this would do to the overall investigation" made the technique imprudent. *Id*.

4.    INTERVIEWS OF SUBJECTS OR ASSOCIATES

With respect to interviews, the Affidavits explained that normally conducted interviews would not be successful regarding the criminal activity because the only persons knowledgeable about the exact nature and content of this illegal activity are the parties who are the direct participants and who are also themselves the subjects of the investigation. Since members of the Buffington DTO were themselves the narcotics traffickers, their participation in a truthful interview would be self-incriminating. As such, any responses to such interviews would contain a significant number of untruths, diverting the investigation with false leads or otherwise frustrating the investigation. Indeed, the Affidavit for the June 21, 2007 wiretaps noted that on May 23, 2007, "Mae Jean Sanders refused to speak to law enforcement regarding the seizure of eight kilograms of cocaine." The Affidavit further noted that "on May 29, 2007, Johnnie Hughes provided misleading statements to law enforcement regarding the ownership of the van from which ten kilograms of

cocaine and $15,000 in suspected narcotics proceeds were seized." WIRS_001_0154. Finally, both Affidavits explained that interviews unrelated to seizures would necessarily alert members of the conspiracy to the existence of this investigation, and thereby compromise the investigation and possibly result in the destruction or concealment of documents and other evidence.

Defendant has not addressed the shortcomings of interviews as an investigative technique, but instead simply advanced her conclusion that such interviews would have worked. To the extent that she argues that it was possible that interviews would be successful, defendant is correct. However, the standard is not whether normal investigative techniques could possibly succeed, but whether they were reasonably likely to do so. The mere possibility that an investigative technique may succeed falls far short of demonstrating that the Chief Judge abused his discretion when he determined that interviews were reasonably unlikely to succeed.

### 5.    SEARCHES BY CONSENT OR WARRANT

With respect to the use of search warrants, the Affidavits clearly stated that "without intercepted communications, the use of search warrants in Chicago would likely not yield a considerable quantity of narcotics or narcotics proceeds, nor would searches be likely to sufficiently reveal the total scope of the illegal operation and the identities of conspirators." WIRS_001_0057; WIRS_001_0155. The Affidavits set forth that "[t]he use of search warrants in this matter has been considered and will likely be employed later in the investigation." *Id*. The justified concern of the Affiants was that, while search warrants might develop prosecutable evidence against some subjects, this would not satisfy the goal of this investigation, i.e., to develop admissible evidence against all participants in the pervasive criminal enterprise concerning the narcotics trafficking. The Affiants further discussed their belief that "search warrants executed at this stage of the investigation would

be more likely to compromise the investigation by alerting the principals to the investigation and allowing other unidentified members of the conspiracy to further insulate themselves from detection." *Id*.

### 6.    TRASH PULLS

With respect to the use of trash pulls, the Affidavit for the May 21, 2007 wire set forth that the DEA had attempted to conduct a trash pull at one of the residences used by Calvin Buffington. WIRS_001_0058. The DEA was unable to complete the trash pull because of pedestrian traffic around the residence. *Id*. Both Affidavits noted that the DEA had not attempted to conduct trash pulls at other locations because of heavy pedestrian traffic, and the ability of the members of the Buffington DTO to conduct counter-surveillance of law enforcement who would conduct the trash pulls. *Id*.; *see also* WIRS_001_0156-0157. As a consequence, the Affiants concluded that the risks posed to agents and the investigation, outweighed the limited information, such as discarded mail containing the names and addresses of the residents of the homes, if discovered, outweighed the limited information that could be discovered by conducting additional trash pulls. *Id*.

### 7.    POLE CAMERAS

With respect to the use of pole cameras, the Affidavit for the May 21, 2007 wire set forth that while Acting Chief Judge Joan H. Lefkow had authorized the installation and use of pole cameras in the vicinity of two residences used by members of the Buffington DTO. WIRS_001_0058-WIRS_001_0059. The Affiant explained that the pole cameras had not yet been installed or used. *Id*. The Affiant noted that it was likely that only limited information would be gained from the pole cameras once they became operational. *Id*. For example, the pole camera at one of the residences would provide only a limited view of that residence. *Id*. As a result, the pole camera would not be

able to identify completely the activities and members of the Buffington DTO. *Id.*   The Affidavit

for the June 21, 2007 wiretaps confirmed that while the pole cameras had become operational, they

had not identified fully the activities and members of the Buffington DTO.  WIRS_001_0156.

8.    <u>PEN REGISTERS/TELEPHONE TOLL RECORDS/TRAPS AND TRACES</u>

With respect to the use of pen registers, telephone toll records, and trap and trace data, the

Affidavits made clear that they had been obtained and used in the investigation.  WIRS_001_0059-

WIRS_001_0060; WIRS_001_0156-WIRS_001_158.  Both Affidavits set forth the limitations of

this investigative technique.  *Id.*  The Affiants explained that pen registers and traps and traces do

not record the identity of the parties to the conversation, nor do they enable law enforcement

authorities to identify the nature and substance of the conversations or to differentiate between

legitimate calls and calls in furtherance of criminal purposes.  Likewise, a pen register cannot,

standing alone, identify the sources of controlled substances or establish proof of a narcotics

conspiracy.  Telephone toll information, which identifies the existence and length of telephone calls

placed from a target telephone to telephones located outside of the local service zone, has the same

limitations as pen registers and traps and traces.  These methods are likely to provide only limited

information concerning the identities and criminal activities of these individuals.  These methods

do not enable law enforcement officers to identify with certainty the persons involved in the

conversations or the significance of the communications in the context of ongoing narcotics

trafficking activities.

The Affiants detailed that much of the subscriber information attached to the telephones

utilized by the violators in this case was fictitious.  Furthermore, many of the telephones in contact

with Target Phone One, and subsequently Target Phone One and Target Phone Two, were pre-paid

- 18 -

cellular telephones with no subscriber information.  The Affiants justifiably concluded that toll

analysis alone would never provide sufficient information regarding Calvin Buffington, much less

his criminal associates or the extent of his criminal activities.  The Affiants determined that only

through the wiretapping of Calvin Buffington's phones accompanied by surveillance, could new co-

conspirators be more fully identified.

9.    <u>MOBILE TRACKING DEVICES</u>

With respect to mobile tracking devices, the Affiants set forth that "[t]he use of mobile

tracking devices has been considered in this investigation but such devices have not have not been

utilized due to the fact that Calvin Buffington and members of the Buffington DTO utilize multiple

vehicles and park those vehicles at their residences, at unknown locations, or on busy residential

streets.  Thus, the installation of the tracking devices could  reveal and therefore jeopardize the

investigation."  WIRS_001_0060; WIRS_001_0158.  The Affiants added that even if mobile

tracking devices were used, they would fail to identify fully the scope of the conspiracy and the

members of the Buffington DTO.  *Id*.

Chief Judge Holderman reviewed the foregoing information in the May 21, 2007 and June

21, 2007 Affidavits, and correctly concluded that the wiretaps at issue were necessary.  Defendant

nonetheless argues more generally that the June 21, 2007 wiretaps were not needed because the

government had garnered enough evidence from the May 21, 2007 wiretap.  It seems that defendant

believes that the sole purpose for government wiretaps was to ensure that it had enough evidence to

meet its burden of proof beyond a reasonable doubt at the trial level.  Of course, defendant offers no

citations in support of this unusual argument, which criticizes the government for assembling proof

beyond a reasonable doubt before invoking the sanctions of federal criminal law, instead of acting before assembling this constitutionally required level of proof.

To state this contention is enough to refute it. Not surprisingly, it has repeatedly been rejected in the case law. For example, the Supreme Court has consistently rejected analogous arguments that a defendant was entitled to be arrested or indicted as soon as the government assembled proof against him beyond a preponderance of the evidence. *See, e.g., United States v. Lovasco,* 431 U.S. 783, 795 (1977) ("Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt."); *United States v. Hoffa,* 385 U.S. 293, 310 (1966) ("Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."). Defendant does not address this case law, which is fatal to her claim.

Case law similarly confirms that it is perfectly appropriate to delay charging someone by way of complaint or indictment to attempt to determine the scope of a criminal conspiracy and to try to gather evidence against other members of that conspiracy. *See, e.g., Lovasco*, 431 U.S. at 792-93 ("[C]ompelling a prosecutor to file public charges as soon as the requisite proof has been developed against one participant on one charge would cause numerous problems in cases in which a criminal transaction involves more than one person or more than one illegal act. In some instances, an immediate arrest or indictment would impair the prosecutor's ability to continue his investigation, thereby preventing society from bringing lawbreakers to justice."); *Plescia,* 48 F.3d at 1463 (holding

that "[e]ven if it were true that the government could have prosecuted Plescia without these [Title III] tapes, the wiretaps both allowed the government to ascertain the extent and structure of the conspiracy and provided enough evidence to convict these five, the key players in the drug ring"). Thus, even if one assumes *arguendo* that the government had enough evidence to indict and even to convict Calvin Buffington, defendant, and other members of the Buffington DTO of at least some crimes prior to any wiretapping, it was perfectly appropriate for the government to wiretap in this case to gather evidence of and against members of the Buffington DTO.  The Chief Judge therefore correctly concluded that the June 21, 2007 wiretaps were necessary.

Based on the foregoing, this Court should deny defendant's motion to suppress Title III materials because the Chief Judge did not abuse his discretion in finding that the May 21, 2007 and June 21, 2007 wiretaps were necessary.

## III.    THE GOVERNMENT PROPERLY MINIMIZED THE WIRETAP CALLS

In assessing the sufficiency of the government's efforts to minimize wiretap calls, this Court must determine whether the steps that agents took to minimize the interception of communications unrelated to the investigation were objectively reasonable given the circumstances confronting the agents.  *See Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723 (1978).  "Although the adequacy of the government's minimization efforts necessarily depends on the facts of each case, relevant considerations include the kind and scope of criminal enterprise that the government was investigating, the thoroughness of the government's efforts to ensure that nonpertinent calls will be minimized, the extent to which the government could have foreseen that certain types of conversations would be innocuous and thus subject to minimization, use of code, and th extent to

which the authorizing judge oversaw the interception efforts." *United States v. Quintana*, 508 F.2d 867, 874-75 (7th Cir. 1975).

"[W]here an investigation involves a drug ring of unknown proportion, as in this case, 'the need to allow latitude to eavesdroppers is close to its zenith.'" *United States v. Mansoori*, 304 F.3d 635, 647 (7th Cir. 2002) (quoting *United States v. Charles*, 213 F.3d 10, 22 (1st Cir.), *cert. denied*, 531 U.S. 915, 121 S.Ct. 272 (2000)). "It is all well and good to say, after the fact, that certain conversations were irrelevant and [monitoring] should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take." *Id*. (internal quotation marks and citations omitted).

Here, the Buffington DTO consisted of family members and life long friends of Calvin Buffington who commonly spoke about personal matters and the business of the Buffington DTO in the same conversation, often in coded language. Defendant identifies a number of "personal"[4] calls that she claims were improperly minimized. Def. Mot. at 12-13. It is well settled "that two to three minutes is a reasonable period of time within which to make an initial judgment as to the pertinence of a conversation." *Id*. at 647-48 (citing cases). Of defendant's list, only three calls are four minutes or longer. *Id*. (Call #230, Call #1197, Call #1198). Of those three calls, two are between Calvin Buffington and Sprint about long distance charges. *Id*. (Call #1197 and Call #1198). Calvin Buffington's use of telephones was critical to the operation of the Buffington DTO. Thus, personnel monitoring those phone calls reasonably deemed those calls to be pertinent.

---

[4]The government is not conceding that every call defendant identifies as "personal" was "non-pertinent". Rather, it is the government's position that the government took adequate steps to minimize all non-pertinent calls.

Moreover, the government instructed the DEA personnel responsible for monitoring the wiretaps on the minimization of non-pertinent and other calls before the interception of wire communications began.  The government subsequently submitted progress reports regarding the wiretaps to the Chief Judge and the Acting Chief Judge, "a circumstance that suggests it conducted the surveillance in good faith."  *Mansoori*, 304 F.3d at 648.  As this Court has found, even if defendant were to prevail on her challenge, "the appropriate relief would be to suppress any conversation or conversations that were inappropriately monitored."  *United States v. Mares-Martinez*, 240 F.Supp.2d 803, 816 (N.D. Ill. 2002) (citing *Mansoori*, 304 F.3d at 647).  ***Defendant was not a party to a single call she contends was inappropriately minimized.***  "Wholesale suppression of all intercepted conversations is reserved for the 'particularly horrendous case'."  *Marez-Martinez*, 240 F.Supp.2d at 816 (citing *Charles*, 213 F.3d at 22).  Defendant has not given this Court any reason to believe that this is "the 'horrendous case' of non-minimization contemplated by *Charles* and *Mansoori*."  Indeed, as defendant admits, the "personal" conversations constitute only a tiny fraction of those intercepted pursuant to the wiretaps.

Based on the foregoing, this Court should deny defendant's motion to suppress Title III materials because the government appropriately minimized the wiretap calls.

## IV.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion to suppress Title III materials.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney


By:    /s/ Terra L. Brown
TERRA L. BROWN
Assistant U.S. Attorney
U. S. Attorney's Office
219 S. Dearborn Street
Chicago, Illinois  60604
(312) 353-3148


DATED:  May 13, 2008